## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 29 2016, 7:09 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of N.A., Mother, and M.A., Father,[1] and A.A., B.A., C.A., N.A., O.A., and Q.A., Children,

N.A.,

*Appellant-Respondent,*

v.

January 29, 2016

Court of Appeals Case No.
45A03-1505-JT-413

Appeal from the
Lake Superior Court

The Honorable
Thomas P. Stefaniak, Jr., Judge

Trial Court Cause Nos.
45D06-1403-JT-75
45D06-1403-JT-76
45D06-1403-JT-77

---

[1] Father does not participate in this appeal; however, pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.

Indiana Department of Child Services,

*Appellee-Petitioner.*

45D06-1403-JT-78
45D06-1403-JT-79
45D06-1403-JT-80

**Kirsch, Judge.**

N.A. ("Mother") appeals the juvenile court's order terminating her parental rights to A.A., B.A., C.A., N.A., O.A., and Q.A. (collectively "the Children"). She raises several issues that we consolidate and restate as: whether sufficient evidence was presented to support the termination of her parental rights.[2]

We affirm.

## Facts and Procedural History

M.A. ("Father") and Mother (collectively, "Parents") are married and are the parents of the Children, who were born between the years 2006 and 2012.[3] On July 20, 2012, then-two-year-old A.A. suffered serious hot water burns while at

---

[2] The juvenile court also terminated the parental rights of the father of the Children, M.A., but he does not participate in this appeal.

[3] Parents have another child, Ne.A., born in July 2013. In January 2014, DCS removed Ne.A., and in February 2014, Ne.A. was adjudicated a CHINS. However, Ne.A. was not part of the termination petition and order that forms the basis of this appeal.

his Gary, Indiana home, where he lived with Parents and his siblings. Parents initially consulted with a Walgreens pharmacist and attempted to treat the burns on their own, but after a friend and registered nurse observed the burns and advised Parents of the severity, Father took A.A. to Gary Methodist Hospital on July 22, 2012. It was determined that A.A. had third degree burns on his left leg from his knee to the top of his foot and second degree burns on the back of his right leg. That same day, A.A. was transferred to University of Chicago Hospital Burn Center, and the Indiana Department of Child Services ("DCS") was notified of the injuries. DCS initially agreed to leave the Children in the home pending further investigation.

[4] Within a day or two after learning of the incident, one or more DCS representatives went to the home to speak to Mother and investigate the incident. Mother told DCS that she was home with the Children on the morning of July 20, but did not witness A.A. getting burned. According to Mother, she received a phone call from the Social Security office and was sitting on the couch on the phone, when C.A. told her that B.A. had burned A.A. during a bath. Mother picked up A.A. and observed that the skin on the top of his foot was "split" or separated due to burns, but that his legs looked normal. *Tr.* at 35. She looked in the bathroom but did not see any water in the tub. She and Father applied ointments and powder to the burns, pursuant to a pharmacist's suggestions. On July 22, a family friend who was a nurse came over to the home, saw A.A.'s legs and feet, and told parents that A.A. had second and third degree burns that needed medical attention. That day, Father

took A.A. to Gary Methodist Hospital. When DCS thereafter came out and spoke to Mother at the home, they observed the condition of the house, which included a flooded basement and visible cockroaches.

[5] On July 24, 2012, DCS filed a child in need of services ("CHINS") petition for each of the six Children.[4] The petition alleged: A.A. suffered second and third degree burns on July 20 but Parents delayed seeking professional medical treatment for the burns until July 22; DCS was concerned for the Children's safety; Parents admitted to DCS that "they smoke" marijuana; and the Children needed "care, treatment, or rehabilitation that is not likely to be provided or accepted without the coercive intervention of the court." *DCS Ex. B.* Parents admitted the petition's allegations, and the juvenile court adjudicated the Children to be CHINS. The detention order, issued that date, found that it was in the Children's best interests to be removed from the home environment and that remaining in the home would be contrary to the welfare of the Children because "the home environment is unable to meet the basic needs of the [Children], and/or the home environment poses a danger to the safety of the [C]hildren." *Appellant's App.* at 8. The order required the following services: drug/alcohol evaluation and treatment, if recommended; parenting assessment; psychological clinical assessment of Mother; and random drug screens for Parents. The juvenile court ordered Parents to secure suitable

---

[4] The only CHINS petition included in the Appendix is that naming A.A. as a child in need of services.

housing, and it granted Parents supervised visitation with the Children. *Id*. at 7-9; *DCS Ex*. C.

[6] On August 3, 2012, DCS, by Family Case Manager Glendora Walker ("FCM Walker") and her DCS supervisor, submitted a Predispositional Report ("Report") to the juvenile court, explaining DCS's involvement and status. The Report stated that DCS removed the Children "due to medical neglect, a back[ed]-up sewer line, lack of air conditioning, and deplorable home condition." *DCS Ex*. D. The Report noted that B.A., N.A., O.A., and Q.A. had a genetic condition called neurofibromatosis, which is known to cause growth of tumors in the nervous system. *Id*. The Report reflected the following recommendations: Parents complete drug and alcohol evaluation; Parents participate in random drug screens; Parents complete a parenting assessment; Mother complete a clinical assessment to determine the need for psychological evaluation; Parents have supervised visitations with the Children; A.A. continue to receive necessary medical treatment; and Parents secure appropriate housing. DCS recommended to the juvenile court, among other things, that Parents contact the FCM every week to allow her to monitor compliance, permit the FCM to make announced or unannounced visits to the home, obtain and maintain "suitable, safe and stable housing with adequate bedding, functional utilities, adequate supplies of food," and "keep the family residence in a manner that is structurally sound, sanitary, clean, free from clutter and safe for the [C]hildren." *DCS Ex*. D. The case plan goal was reunification. On August 22, 2012, the juvenile court held a dispositional hearing, adopting the

Report as findings. The juvenile court ordered Parents to fully participate in the recommended services, and reunification was identified as the permanency plan.

[7] Two months later, DCS, through FCM Walker and her DCS supervisor, submitted a progress report to the juvenile court, advising of the condition of the Children and explaining what "reasonable efforts" that DCS had provided to facilitate the permanency plan. Those included: a home-based case manager to assist Parents in finding employment, housing, and transportation to assessments. DCS reported that Parents maintain that they are self-employed and that "DCS should provide the financial assistance needed" for a deposit and first month's rent for a home; however, DCS "could not assist the [Parents] . . . because either [F]ather or [M]other received a regular monthly income sufficient [] to pay the rent and support the family." *DCS Ex.* F. DCS also reported that one service provider, Nu-Source, stated that Parents "are not interested in following through with employment and finding [] appropriate housing." *Id*. The matter came for a review hearing in December 2012. The juvenile court ordered that the Children were to remain in their current foster placement, Father was to have a psychological evaluation and cooperate with random drug screens, and Mother was to have a psychiatric evaluation.

[8] In early March 2013, DCS, through FCM Walker and her DCS supervisor, submitted a progress report to the juvenile court, updating the juvenile court with information about the Children's psychological and physical conditions. The report advised that the Children had not returned home due to Parents'

inability to find appropriate housing and employment. A review hearing occurred several weeks later. The following individuals attended the hearing: Mother, Father, the DCS attorney, the court appointed special advocate ("CASA"), FCM Walker, several caseworkers from at least three service providers, and the foster father. The ensuing order indicated that the plan continued to be reunification, but did not identify other progress or status regarding services. However, a DCS progress report submitted to the juvenile court on June 10, 2013, stated, among other things, that Parents had acquired housing in April 2013, that FCM Walker reviewed the home and observed that Parents needed additional mattresses and a working refrigerator and stove, as at that time the home only had a microwave for cooking. In September 2013, following a review hearing, the juvenile court suspended the supervised visits occurring at the home, due to the home's condition. The juvenile court also ordered Parents to continue with counseling and marital counseling. A September 20, 2013 progress report stated that Mother had given birth in July 2013 to another child and that Parents had the required necessities for her. However, at the last Child and Family Team Meeting ("Team Meeting"), it was recognized that the home had become infested with cockroaches. The next progress report of December 2013 stated that "the [P]arents have been actively participating in services[,]" but that "case plan goals have not yet been completed[.]" *DCS Ex.* P. The report reflected that a psychiatrist had prescribed Seroquel, a psychotropic drug, to Mother; however, Mother failed two specialized drug screens because she was not taking the medication as prescribed. Parents' visitations with the Children remained suspended.

[9]     In January 2014, the juvenile court held a permanency review hearing, and in attendance were Mother, Father, CASA, DCS attorney and then-FCM Delpha Roberts ("FCM Roberts"), the foster mother, and representatives from three service providers. The juvenile court issued an order changing the permanency plan from reunification to termination,[5] and in March 2014, DCS filed a petition for termination of Parents' parental rights.

[10]    In August 2014, DCS, by FCM Roberts and her supervisor, filed another progress report in the CHINS proceedings, advising, among other things, that Mother was not compliant with taking the medications prescribed by her psychiatrist, Parents had not been able to provide stable and suitable housing for the Children, Parents were "several months behind in their rent, leading to eviction," and the home had a "recurring cockroach problem." *DCS Ex.* T. The August progress report also stated: Mother had not seen her psychiatrist for four or five months and that she was "a no show" for the last three appointments; she refused to take one medication at the recommended level and she refused to take another one at all; she had not seen her family or individual therapist for two months, and she "does not comply" with recommendations for home-based case work. *Id.* The report stated, "DCS and the service provider[s] have made every effort to accommodate the [Parents], yet they remain non-compliant." *Id.* For instance, DCS arranged the

---

[5] The juvenile court also removed Ne.A. from the home "[d]ue to concerns of the newborn's health and safety," and it directed DCS to bring the matter for a CHINS detention hearing. *DCS Ex.* R.

appointments for provided services to Mondays as requested by Parents, Regional Mental Health provided a walker and a wheelchair to help Mother in ambulating, and Mother "refuses to take her medication or see her psychiatrist[.]" *Id*. FCM Roberts had been to Parents' home several times to do a drug screen on Mother, but "was not able to gain entry to the home," noting, "When [Mother] is home alone she does not answer the door." *Id*. At the end of July 2014, Father had told FCM Roberts that he and Mother were moving to a new address during the first week of August, but when FCM Roberts went to that address on August 12, 2014, it was boarded up and uninhabitable. A February 2015 progress report stated that Mother had moved to East Chicago, with her parents, but in February 2015, returned to the home, which "still has a problem" with cockroaches and also bed bugs. *DCS Ex.* X.

[11] On April 14, 2015, the juvenile court held a fact-finding hearing on the termination of parental rights petition, and the testimony presented included the following. Mother testified about A.A. being burned by water at home on July 20, 2012, describing that C.A. told her that B.A. had burned then-two-year-old A.A. in the bathtub. Mother stated that, before Father left for work, he bathed some of the Children and told Mother to finish getting them dressed and that he was leaving for work. Upon DCS's inquiry, Mother testified that she looked in the bathroom and she "didn't see [any] water in the tub[,]" so she did not know exactly how it happened. Mother described that, at first, A.A.'s leg looked "normal" or "natural," but that the skin on the top of his foot was "separated" and she knew he had been "scalded." *Id*. at 35, 92. Mother stated that A.A.

"wasn't crying" at the time. *Id*. at 41. Mother acknowledged that she knew that A.A. needed to be seen by a doctor, but she did not want to call 911 because she was the only adult in the house and thus she would not be able to accompany A.A. in the ambulance, so she called Walgreens and talked to a pharmacist about treatment of water burns. Mother then called Father, telling him to bring home Neosporin, but he did not. When Father got home, he snapped a picture of A.A. and walked to the Walgreens pharmacy and showed the pharmacist. Thereafter, Parents treated the burns with Neosporin, powder, and gave A.A. Tylenol and ibuprofen. The skin on his legs "got extremely worse," and Mother described that, the next day, A.A.'s leg looked "totally burnt," like "a struck match." *Id*. at 42-43.

[12] As to the home's condition, Mother testified that the home "was falling completely apart," as the basement was flooded up to the bottom step, and the bathroom sink "had fell down." *Id*. at 36. She agreed that the home had a "bad infestation" of cockroaches. *Id*. at 47. Mother and Father looked for different housing and eventually moved out of the flooded house a month or two after the Children were removed. They lived in two or more motels as they looked for a residence. In April 2013, they found a three-bedroom home to rent, also in Gary. Mother stated that that home was free of cockroaches when she and Father moved in, but later had some cockroaches and bed bugs.

[13] Mother testified that she and Father had marital issues. She referred to Father as having an anger management problem, and she said Father brought another woman and her child into the home for a period of time. When asked whether

the home's condition was suitable for the Children, Mother maintained, "[M]y husband is the issue. The home is not the issue." *Id*. at 86.

[14] As to substance abuse, Mother acknowledged that she and Father had used marijuana in the past. *Id*. at 50. As to Mother's mental health, Mother testified that she "was dealing with psychiatrists" before having children, and that on one or more occasions, she had been hospitalized by her parents and siblings. *Id*. at 55. She testified to being diagnosed with bipolar disorder "and a little bit of OCDC [sic]." *Id*. She acknowledged that in the past she sometimes suffered from hallucinations. Mother explained that she was not willing to take the prescribed dose of Seroquel because it made her sleep too much. Mother is a licensed cosmetologist, but stated that she had not been able to work since April 2014 due to health issues, including peripheral neuropathy.

[15] Karen Sheets ("Sheets"), a home-based caseworker from Regional Mental Health ("Regional"), also testified. She explained that her job was to provide home-based case work services intended to assist Parents with maintaining a stable residence, employment, and family relationships. She also assisted with arranging transportation. She met weekly with Parents, beginning in March 2013. With regard to Mother's mental health issues, she stated that Dr. Ilyas with Regional prescribed three medications, but Mother admitted that she was not taking the medications as prescribed, believing that the Seroquel dose, prescribed for sleep, was too strong, and she refused to take Invega, for hallucinations, at all. Mother did not see her psychiatrist from February 2014 to January 2015. As for the condition of the home and visitations with the

Children, in August 2013, DCS allowed the supervised visits to occur in the home because Mother recently had given birth to Ne.A. However, the in-home visitations were suspended in September 2013 because of the home's condition. In July 2014, Parents were evicted from their residence because they were behind in rent. They moved to another home, but it too eventually had cockroaches and bed bugs. Sheets explained that Mother suffers from some health issues, including diabetes, and that Mother was not medically compliant. Sheets made an appointment for Mother with a nutritionist, but when Sheets arrived to take her to the appointment, Mother would not get out of bed. Sheets shared that she made "numerous attempts" to get Parents to make "better life choices" but they would not participate. *Id.* at 101. She said Parents blamed each other, neither would take responsibility, and she had observed fighting between them. Sheets concluded that while Parents were "always [] cooperative," they had not made the changes needed. *Id.* at 96. "They're always trying; it's just that they don't ever accomplish the task." *Id.* at 98. She described this as a "consistent pattern." *Id.* at 112. Sheets concluded that she did not believe that Mother was "physically or mentally able to take care of the Children." *Id.* at 114.

[16] FCM Roberts, who assumed responsibility over the case in November 2013, also testified at the termination hearing. She testified primarily as to the services offered to Parents and their compliance with them. FCM Roberts explained that a "myriad" of services had been offered with the goal of reunification, including family therapy, individual therapy, psychological

therapy, and home-based services, and transportation services. *Id*. at 118. DCS more than once changed providers to accommodate the family's issues, and DCS arranged for services to occur on Mondays as Parents requested. DCS also implemented having a monthly Team Meeting in an effort to increase Parents' compliance and accomplish the goals of the case plan. FCM Roberts stated that, in general, Parents completed the various recommended assessments, but thereafter failed to complete the recommended services. She testified that the juvenile court suspended the supervised visitations at least in part because Mother was not compliant with taking the medications that the psychiatrist prescribed, one of which was for hallucinations. "[T]he concern with the medication was safety for the children." *Id*. at 122. FCM Roberts testified that "in the past three months" Parents had been "better" about compliance with service providers, but that "[n]one of the goals have been reached." *Id*. at 126. FCM Roberts also testified,

> The issues have not changed. Since the onset of the case, no matter how many things we try[.] . . . [E]very other month we come together as a team to help them move forward. We've done every service that we could put in place, including with the wheelchair and the [] dietician. You know, they can't take care of themselves[.] . . . So DCS does not believe . . . that they can care for the six or seven [] children."

*Id*. at 127. FCM Roberts opined that there was a reasonable probability that the conditions that led to the Children's removal would not be remedied and that the continuation of the parent-child relationship posed a threat to the Children's

well-being.  She also testified that it was in the Children's best interests for Parents' parental rights to be terminated.

[17] On April 16, 2015, the juvenile court issued its findings of fact, conclusions, and order terminating Parents' parental rights to the Children.  Mother now appeals.

## Discussion and Decision

[18] As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make.  They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]"  *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014).  When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses.  *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009).  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous.  *Id*. at 148-49.

[19] Here, in terminating Mother's parental rights to the Children, the juvenile court entered specific findings and conclusions.  When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review.  *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*.  First, we determine whether the evidence supports the findings, and

second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[20] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *Id*. at 1155. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re H.L.*, 915 N.E.2d at 149. In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).

[21] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[22] Mother asserts that "even though [she] was in total compliance with her case plan," DCS filed a petition for termination of parental rights. *Appellant's Br.* at 2. She urges us to reverse the juvenile court's termination, claiming that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, she contends that DCS failed to present sufficient evidence that the conditions that resulted in the Children being removed or the reasons for their placement outside the home would not be remedied. Mother also argues that DCS failed to present sufficient evidence that the continuation of the parent-child relationship posed a threat to the Children's well-being. In addition, she asserts that DCS did not present sufficient evidence that the termination was in the Children's best interests or that there was a satisfactory plan in place for the Children.

### *Remediation of Conditions*

[23]    In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.,* 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are

required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[24] Here, the Children were removed from the home on July 24, 2012, after learning that A.A. had suffered serious burns to his legs and feet caused by hot water. Mother did not witness the incident, but stated that C.A. told her that B.A. burned his brother A.A. in the bathtub. Although Mother knew that A.A. was "scalded," she did not seek immediate medical care. *Tr.* at 35, 92. Rather, she and Father treated what was determined to be second and third-degree burns by giving A.A. ibuprofen and Tylenol and applying Neosporin and powder to the burns. Parents took A.A. for medical attention on July 22, and the child was transferred to the University of Chicago Hospital. Upon learning of the situation, DCS went to the home, which was in "deplorable" condition, including having a basement flooded to the bottom step and being infested with cockroaches. *DCS Ex.* D.

[25] After the Children were found to be CHINS and were removed from the home, Parents were ordered to find suitable housing and employment, undergo various assessments, and complete recommended services. Throughout the course of the proceedings, DCS offered Mother and Father many services, assessments, and opportunities. With regard to Mother, although she completed assessments, she did not follow through with completion of recommended services. She did not see her psychiatrist regularly, at one point going almost a year without an appointment, and she did not take the

medications as prescribed by the psychiatrist. At times, Mother would not get out of bed or even answer the door when a family case manager arrived to take her to an appointment. Parents moved to several residences, but each time the home at some point would be found to have cockroaches or other infestation. Parents were evicted from one residence for delinquent rent. Mother stated that, due to her physical ailments, she could not be employed, but she also failed to attend to her medical needs. Although FCM Roberts testified that Parents had been "better" about compliance with services in the few months preceding the termination hearing, they had a consistent pattern of failing to "accomplish the task." *Id.* at 98, 126. FCM Roberts testified that in her opinion there was a reasonable probability that the problems that led to removal would not be remedied. *Tr.* at 127.

[26] As we have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Here, based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in the Children's placement outside the home will not be remedied.

### Threat to Well-Being

[27] Mother also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the

parent-child relationship posed a threat to the well-being of the Children. However, we need not address such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of the Children would not be remedied, it is not necessary for us to address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of the Children.

[28] That said, DCS presented evidence that the Children had MRSA and scabies when they arrived in foster care. They also exhibited "trauma issues," and at the time of the termination hearing were still receiving play therapy through a service provider to address those issues. *Tr.* at 131. It was noted at the termination hearing that several of the Children have medical needs "that require them to go to Indianapolis periodically" for treatment, and FCM Roberts expressed concern about Parents' ability to provide the necessary medical care for the Children, given Parents' inability to care for their own medical issues. *Tr.* at 129. In addition, Mother acknowledged that she has, at times, experienced hallucinations, and Father testified to having called the police during one or more of her episodes; yet, Mother refuses to take the prescribed medication. FCM Roberts testified that, since being in foster care,

the Children "have made tremendous progress" and "are thriving" with the foster family. *Id*. at 129-30. Their medical and psychological needs are met, and, "There's always food. The [C]hildren are always neat and clean. The home is always clean[.]" *Id*. at 130. We have recognized, "[A] trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *In re A.F.*, 762 N.E.2d at 1253. Here, Mother has not demonstrated that the juvenile court's conclusion that continuation of the parent-child relationship poses a threat to the Children's well-being is clearly erroneous.

### Best Interests

Mother next argues that insufficient evidence was presented to prove that termination is in the best interests of the Children. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id*. (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for

permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id*. (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[30]   Mother asserts that "DCS failed to possibly come close" to proving by clear and convincing evidence that the termination was in the Children's best interests. *Appellant's Br*. at 10.  We disagree.  As discussed above, the Children were removed after DCS learned that one of six children at the home suffered second and third-degree burns, and Parents delayed obtaining medical treatment for two days.  The home was infested, flooded, and was not suitable for the family.  Parents never were able to remedy the situation.  They never obtained suitable housing or employment.  Mother failed to complete services and refused to take medicines as prescribed by the psychiatrist and also did not attend to her medical needs or disabilities.  Sheets opined that Mother was not "physically or mentally able to take care of the Children."  *Tr*. at 114.  FCM Roberts testified that she believed that termination of Parents' parental rights was in the Children's best interest.  Mother argues that the juvenile court "failed to address the pain and suffering that the [C]hildren will have to suffer when they realize that they will not have any further contact with their mother."  *Appellant's Br*. at 10.  However, this is a request for us to reweigh the evidence, which we cannot do. *In re H.L.*, 915 N.E.2d at 149.  We conclude that sufficient evidence was presented to prove that termination was in the best interest of the Children.

## *Satisfactory Plan*

[31] Mother also asserts that DCS failed to establish that there is a satisfactory plan for the care and treatment of the Children. For a plan to be "satisfactory," for purposes of the statute, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.,* 804 N.E.2d at 268. Here, the juvenile court concluded that DCS "has a satisfactory plan for the care and treatment of the [C]hildren which is Adoption by the foster parent[.]" *Appellant's App.* at 5.

[32] Although conceding that "possibly DCS has a plan" for the Children, Mother nevertheless argues that DCS failed to prove that it had a satisfactory plan for the Children. *Appellant's Br.* at 5. We reject that claim. FCM Roberts testified that the current foster home, where all of Mother's children were placed, provided for the medical, physical, and emotional needs of the Children, and she stated that the Children were bonded to their foster mother. When asked if the foster parent was willing "to adopt the six [C]hildren that are the subject of today's case," FCM Roberts replied, "Yes, she is." *Tr.* at 131. Mother highlights that the foster parent did not testify at the termination hearing, arguing "therefore, we can only assume from the testimony of the Case Manager that [the foster parent] intends to adopt the [C]hildren." *Appellant's Br.* at 10. To the extent that Mother's argument is that DCS's plan needed to be more specific or identify more specific commitment on the part of the foster home, we reject that claim. We have held,

> A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children.

*In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied* (internal citations omitted).

[33] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to the Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[34] Affirmed.

[35] Mathias, J., and Brown, J., concur.